Filed 12/20/22  P. v. Celestine CA6
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> MOSES ANTHONY CELESTINE, <br><br>     Defendant and Appellant. | H049673 <br> (Monterey County <br> Super. Ct. No. 21CR005294) |

A jury convicted defendant Moses Anthony Celestine of two counts of rape by force or fear and one count of oral copulation by force or fear against a 14-year-old minor.  The trial court sentenced Celestine to 32 years in prison, consisting of three upper-term, consecutive terms.

On appeal, Celestine raises seven claims of error.  Stated broadly, he challenges the trial court's admission of a psychologist's testimony regarding child sexual abuse victims, the trial court's related instruction using a modified version of CALCRIM No. 1193, his defense counsel's failure to object to the prosecutor's closing argument about the jury's consideration of lesser related offenses, and various aspects of his sentence.

For the reasons explained below, we affirm the judgment.

# I.  FACTS AND PROCEDURAL BACKGROUND

A.  *Procedural History*

In September 2021, the Monterey County District Attorney filed an information charging Celestine with two counts of forcible rape of Jane Doe, a minor 14 years of age or older, on or between November 1, 2020, through November 30, 2020, and December 31, 2020, through January 1, 2021, respectively (Pen. Code, §§ 261, subd. (a)(2), 264, subd. (c)(2);[1] counts 1 & 3), and one count of forcible oral copulation of Jane Doe, a minor 14 years of age or older, on or between December 31, 2020, through January 1, 2021, (§ 287, subd. (c)(2)(C); count 2).

In November 2021, the jury found Celestine guilty as charged.

In December 2021, the trial court sentenced Celestine to a total determinate term of 32 years in prison, comprising an upper term of 11 years for count 1, a consecutive upper term of 10 years for count 2, and a consecutive upper term of 11 years for count 3. The court ordered payment of various fines, fees, and assessments, including a $7,500 restitution fine (§ 1202.4, subd. (b)), a suspended $7,500 parole revocation restitution fine (§ 1202.45), a $1,230 sex offense fine (including certain penalty assessments) (§ 290.3), a $120 court operations assessment (§ 1465.8), and a $90 court facilities assessment (Gov. Code, § 70373).

In January 2022, Celestine timely appealed the judgment.

In March 2022, Celestine's appointed appellate counsel sent a letter to the trial court requesting that it stay the restitution fine and strike the sex offense fine and the two assessments pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).  On May 17, 2022, the trial court denied the request.

---

[1] Unspecified statutory references are to the Penal Code.

2

B.  *Evidence Presented at Trial*

In August 2020, 14-year-old Jane Doe and her mother moved into a studio apartment in Monterey County.  A few weeks later, Doe's mother introduced Doe to Celestine, who was 41 years old.  Thereafter, Doe saw Celestine almost daily, and he visited Doe's apartment.  Doe, her mother, and Celestine sometimes rolled dice together in Doe's apartment, at Celestine's apartment, or outside their apartment complex.  Doe described the neighborhood around the apartment complex as unsafe; she did not have any friends or trusted neighbors in the complex.

Around Thanksgiving 2020, Celestine knocked on the door of Doe's apartment. Doe opened the door and told Celestine that her mother was not home.  He responded, " 'I know' " and asked if he could come inside and roll dice.  Doe let him in and began rolling dice.  Celestine asked Doe if she wanted to smoke marijuana.  She said "sure" and smoked the marijuana that he provided.

Doe noticed that Celestine was staring at her.  He scooted closer to Doe and started rubbing her upper thighs.  This scared her.  Celestine reached behind Doe's neck and started to kiss her on the lips.  When she moved back and tried to push him away, he tightened his grip on her neck.  Celestine then stopped kissing Doe and told her that they should go to the bed.  He grabbed her wrist and led her there.  Doe did not want to go to the bed but went because she was afraid of what would happen if she did not do so. Celestine told Doe to lie down on her back.  He dropped his pants, pulled down Doe's sweatpants and underwear, and got on top of her.  He smelled of alcohol.  When Doe tried pushing Celestine off of her, he pressed harder against her with his body weight. Doe felt Celestine put his penis inside her vagina.  After Celestine pushed against Doe hard the last time and then got off of her, he told Doe that he loved her, went to the bathroom, and left the apartment.

Doe testified that she did not want Celestine to do what he did to her and felt "dirty" afterwards.  She did not tell her mother about the incident because she was scared

3

of what would happen if her mother reported it and what her mother might do.  In the following weeks, Doe tried blocking any electronic messages from Celestine, but he texted her from different cell phone numbers.  He told Doe several times that she was meant for him.  Doe tried to avoid Celestine when she saw him at the apartment complex.

Later, on a night around New Year's Eve, Doe and her mother were outside their apartment drinking whiskey and rolling dice with several people for a few hours.  Doe began feeling the effects of the alcohol and "was sort of struggling to walk."  After Doe's mother left the gathering in a car without telling Doe, a friend of Doe's mother's told Doe that she would walk Doe upstairs to her apartment.  Celestine approached Doe and the friend as they made their way toward Doe's apartment and said that he would walk Doe upstairs.  Doe and Celestine then continued on to her apartment.  There, Celestine told Doe to change her clothes.  After she did so, the two went to Celestine's apartment.

At his apartment, Celestine told Doe to take a shower.  When Doe got out of the shower, he offered her methamphetamine in a pipe, which she declined.  He then went into the restroom with the pipe.  After a few minutes, he exited the restroom, sat on the bed, pulled down his pants and underwear, and exposed himself.  Doe believed that Celestine was going to do what he had done to her before, and she did not want that to happen.  Celestine told Doe, " 'You can look.  You can touch it.  It's fine.' "  Doe was sitting on the bed, turning herself away and trying not to look.

Celestine grabbed the back of Doe's neck, pulled her towards him, and told her to open her mouth.  Doe tried to resist, but Celestine forced her to "go down."  Celestine put his penis in Doe's mouth and pushed her head down.  When Doe tried to pick her head up, Celestine pushed down harder on the back of her neck and tried to grab her hair.  Doe could not breathe and started crying.  She pulled her head up, and Celestine "let go."  Still holding Doe's neck, Celestine next pushed Doe facedown onto the bed and pulled down her pants.  He got behind Doe, let go of her neck, and pushed his penis into her vagina.

4

Doe was scared and cried.  Celestine put his hand over her mouth and angrily told her to stop making noise.  After a couple of minutes and one last, hard push, he got off of her.

Celestine told Doe, " 'You know I love you, right?' "  He also said that if Doe told anyone what had happened, her mother would get arrested and Doe would be put into the "system."  This scared Doe because she had only recently returned to living with her mother (after living mostly with an aunt) and thought she "would get taken from her [mother] again."  Celestine eventually fell asleep, and Doe stayed at his apartment until daylight and then left.  Doe called her mother but did not tell her what had happened because Doe was ashamed.

In the following weeks, Doe avoided Celestine as much as she could.  He texted her and told her to stop blocking his messages.  He also got mad when Doe would not talk to him.  In late March 2021, Doe reported to police what Celestine had done to her because she "had moved out of [her] mother's house" and was staying with her grandmother.  At that time, she felt it was safe to disclose the incidents because she "knew that [she] wouldn't be taken" by child protective services.

Salinas Police Department Detective Luis Toribio obtained permission from Doe to use her Facebook account to communicate with Celestine.  Pretending to be Doe, Detective Toribio messaged Celestine using Facebook and said, among other things, that Doe was engaging in sexual intercourse with other men, but Celestine was the only one who made it feel special.  Toribio fabricated this detail in order to provoke a response from Celestine.  Celestine engaged with Toribio, and Toribio arranged a pretext phone call between Doe and Celestine in an effort to get him to discuss the alleged crimes.  However, Doe only managed to ask one question during the pretext call before she got scared and hung up.

On July 2, 2021, Detective Toribio spoke with Celestine at his apartment.  Toribio recorded the interview using his body-worn camera, and the recording was played for the

5

jury. Near the end of that interview, Celestine admitted that he had had sex with Doe but said he was the victim, he did not consent to the sex, and Doe had pulled his pants down.

Clinical psychologist Dr. Blake Carmichael testified about common myths and misconceptions regarding child sex abuse. Dr. Carmichael did not review any reports about this case or know any case facts or allegations. Dr. Carmichael testified that he would not opine on whether Doe were actually victimized.

When testifying about his background and credentials, Dr. Carmichael described the therapy that he and his colleagues at the University of California, Davis Children's Hospital provide for victims of child sexual abuse, calling it "trauma focused cognitive behavioral therapy" (TFCBT). He said, "In short, [TFCBT] helps kids and their parents identify myths and misconceptions they might have about trauma, understand how trauma affects kids, even the family system, and then works with kids and their parents or caregivers to develop coping skills to better deal with the effects of being traumatized. And it exposes them to better dealing with the thoughts, reminders of the trauma itself."

Regarding common myths and misconceptions about child sex abuse, Dr. Carmichael identified the misconceptions that sexually abused children report the abuse immediately, look or behave in a certain way, or become angry at or afraid to be around the abuser. He also identified the misconception that children try to draw attention to what is happening to them in order to stop it. Dr. Carmichael explained that child abuse must be viewed "in the context of a relationship and the broader community or family that [the children] live in to understand why kids may not tell right away, feel confident telling, or may not tell at all." Children might not report abuse because they fear the consequences of doing so or feel guilt, shame, or embarrassment.

Dr. Carmichael described how some children deal with abuse by disassociating, i.e., they "just try to numb out, space out, stare into the corner of the room, or have a song playing in their head while the abuse is occurring to disconnect themselves or really

6

distance themselves from what is going on." Disassociation can affect a child's memory of what happened.[2]

Dr. Carmichael explained that responses by children to sexual abuse are unique and could include "freezing" rather than "fight/flight." He stated it is a misconception that children who do not report or try to stop sexual abuse in the moment "ask[ed] for it" or "enjoyed it. It just means that the negative consequences of telling can still outweigh those situations."

Celestine did not present any evidence in his defense.

## II. DISCUSSION

Celestine raises seven claims of error. He contends: (1) the trial court erred by admitting Dr. Carmichael's testimony; (2) the trial court erred by instructing the jury on Dr. Carmichael's testimony with a modified version of CALCRIM No. 1193 (CALCRIM 1193); (3) defense counsel was constitutionally ineffective for failing to object to statements by the prosecutor in closing argument regarding the jury's consideration of lesser related offenses; (4) the matter should be remanded for a new sentencing hearing due to recent changes to section 1170 made by Senate Bill No. 567 (2021-2022 Reg. Sess.) (hereafter, Senate Bill 567); (5) the trial court erred by imposing full, separate, consecutive sentences on counts 2 and 3 under section 667.6, subdivision (d) (hereafter, section 667.6(d)); (6) the Sixth and Fourteenth Amendments require jury findings on the facts specified for consecutive sentencing under section 667.6(d); and (7) the trial court abused its discretion in denying Celestine's postjudgment request to stay the restitution fine and to strike the sex offense fine and the two assessments.

We address Celestine's claims in turn.

---

[2] We note that although the reporter's transcript states Dr. Carmichael used the terms "disassociation" and "disassociated," the psychological condition that Dr. Carmichael described is known as "dissociation." (See *People v. Cortes* (2011) 192 Cal.App.4th 873, 911.)

A. *Claims Regarding Dr. Carmichael's Testimony and Related Jury Instruction*

Celestine contends the trial court abused its discretion in admitting Dr. Carmichael's testimony about the common myths and misconceptions surrounding child sexual abuse and thereby violated constitutional due process protections. Celestine asserts that this error was prejudicial under both *Chapman v. California* (1967) 386 U.S. 18 and *People v. Watson* (1956) 46 Cal.2d 818.[3]

Relatedly, Celestine contends the trial court erred by using CALCRIM 1193 to instruct the jurors on their consideration of Dr. Carmichael's testimony. Celestine argues that the instruction was legally erroneous because "[t]he last portion of CALCRIM [] 1193 violates the rule prohibiting the use of [Child Sexual Abuse Accommodation Syndrome (CSAAS)] testimony to conclude a witness' claim of sexual abuse is true."

### 1. Background

Pretrial, the prosecutor filed an in limine motion to admit Dr. Carmichael's expert testimony about child sex abuse victims' "counter-intuitive behaviors." The prosecutor stated that Dr. Carmichael's testimony would cover "a variety of topics concerning victims of child molestation, including some of the common myths and misconceptions surrounding child sexual abuse." The prosecutor argued that this type of testimony is relevant because "[j]urors usually have no personal experience with child molestation or the paradoxical behavior [that] practitioners observe in molested children and often hold false preconceived notions on the behavior of child molestation victims." Additionally, the prosecutor proposed that the trial court should give a limiting instruction regarding the testimony and stated that CALCRIM 1193 "needs to be modified to counter intuitive victim behavior" (some capitalization omitted).

---

[3] The Attorney General does not argue forfeiture in response to Celestine's claim of error. Under these circumstances, we will assume arguendo that Celestine's claim was preserved for our review, decide the merits of the claim, and forego addressing Celestine's alternative ineffective assistance of counsel claim.

Celestine's defense counsel, likewise, filed an in limine motion to exclude testimony regarding CSAAS or "expert testimony regarding how sexually abused children conduct themselves regarding the reporting of the abuse." Counsel argued that such testimony could "encourage the jury to use the syndrome and characteristics to assume that the complaining witness [] in this case [was] sexually abused."

At a pretrial hearing on the in limine motions, the prosecutor confirmed to the trial court that he did not intend to introduce testimony about CSAAS specifically (or the work of its progenitor, Dr. Roland Summit) but rather would present testimony from Dr. Carmichael to "disabuse [the jurors] of commonly held misconceptions." The trial court ruled that the prosecutor's proposed testimony was "relevant in a limited way," as described in the prosecutor's motion and "within the parameters of" *People v. Munch* (2020) 52 Cal.App.5th 464 (*Munch*).

As detailed *ante* (part I.B.), Dr. Carmichael testified about common myths and misconceptions concerning how children respond to sexual abuse.

When instructing the jury after the close of evidence, the trial court instructed on Dr. Carmichael's testimony with a modified version of CALCRIM 1193 as follows: "You have heard testimony from Dr. Blake Carmichael regarding the behaviors of juvenile sexual assault victims. [¶] Dr. Carmichael's testimony regarding behaviors of victims of juvenile sexual assault is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

There is no indication in the record that Celestine's defense counsel objected to the trial court's instruction on Dr. Carmichael's testimony.

### 2. Analysis

We begin our analysis by considering Celestine's challenge to the admission of Dr. Carmichael's testimony. As Celestine acknowledges, expert witness testimony is

9

admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Further, it must be "[b]ased on matter (including [the expert witness's] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the witness's] testimony relates." (*Id.*, subd. (b).)

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) " 'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.' " (*People v. Brown* (2014) 59 Cal.4th 86, 101; see also *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).)

Celestine argues that "[b]ecause Dr. Carmichael here did not testify specifically as to CSAAS, his framework for the common myths and misconceptions surrounding child abuse was instead Trauma Focused Cognitive Behavioral Therapy." In turn, Celestine asserts that "[w]hile expert testimony on CSAAS has been held admissible for this purpose, . . . T[F]CBT, a therapy that helps only abuse survivors and their parents, has not been similarly evaluated and scrutinized by the courts." Celestine contends that the prosecutor failed to demonstrate the relevance of Dr. Carmichael's TFCBT-based testimony and, further, Dr. Carmichael's testimony also constituted CSAAS evidence that should have been excluded.

We are not persuaded that the trial court erred in admitting Dr. Carmichael's testimony. As an initial matter, we reject Celestine's assertion that Dr. Carmichael's testimony was based on TFCBT. That assertion is not supported by the testimony. As

10

described *ante* (part I.B.), Dr. Carmichael discussed TFCBT when testifying about his background and credentials. Although the prosecutor subsequently mentioned Dr. Carmichael's "work . . . to train victims and family members regarding common myths and perceptions on child sex abuse" when asking Dr. Carmichael to identify "those common myths and misconceptions that are still out there even today," Dr. Carmichael did not say that his testimony was in fact based on TFCBT. Thus, TFCBT itself is not at issue here. Rather, Dr. Carmichael's testimony was based on his stated expertise more generally and is akin to CSAAS evidence in that it explained the common misconceptions about a child's reaction to sexual abuse. Given this context, Celestine's claim is most appropriately construed as turning on whether such expert testimony, when offered to address the misconceptions, is irrelevant or otherwise inadmissible.

Generally, expert testimony like that provided by Dr. Carmichael on common reactions to child molestation is permissible under California precedent. (See *McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301.) As our Supreme Court explained some years ago, " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id*. at p. 1301.) More recent precedent also has confirmed the admissibility of such expert testimony as relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse. (See, e.g., *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171–172 (*Lapenias*); *Munch*, *supra*, 52 Cal.App.5th at pp. 468–472; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956 (*Housley*).)

In light of this precedent, and based on this record, we are satisfied that Dr. Carmichael's testimony was properly admitted to dispel certain common misconceptions regarding the behavior of child sexual abuse victims. We thus conclude the trial court here did not abuse its discretion when it ruled pretrial that the prosecution's proposed expert testimony was relevant and admissible. (See *Lapenias*, *supra*, 67

11

Cal.App.5th at p. 172, *Patino*, *supra*, 26 Cal.App.4th at pp. 1744–1745; *Housley*, *supra*, 6 Cal.App.4th at p. 956.)

Because we discern no error by the trial court in admitting Dr. Carmichael's testimony, we need not address Celestine's assertion of prejudice resulting from the alleged erroneous admission of that testimony. Moreover, we decide that Dr. Carmichael's testimony did not violate Celestine's constitutional right to due process. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 174; *Patino*, *supra*, 26 Cal.App.4th at pp. 1746–1747.)

Turning to Celestine's challenge to the related jury instruction, he argues that although the instruction correctly told the jurors that they could not use Dr. Carmichael's testimony as evidence that he committed the crimes, the last sentence of the instruction impermissibly allowed the jurors to use that testimony in deciding the believability of Jane Doe's testimony. Celestine asserts that no objection at trial was required for our review of his claim because the instruction is legally erroneous and affected his substantial rights (§ 1259). He argues further that the instruction lightened the prosecution's burden of proof, allowed the jury to make an unreasonable inference that Doe was telling the truth, and thus deprived him of his constitutional rights to due process and a fair trial. Lastly, he asserts that the error was prejudicial under *Chapman* and *Watson*.

The Attorney General counters that Celestine forfeited his appellate claim by failing to object to the instruction at trial and, in any event, the instruction properly informed the jurors about their use of and the limitations on Dr. Carmichael's testimony.

Regarding forfeiture, we decide that we can consider the merits of Celestine's claim despite his failure to object at trial because he contends the challenged instruction was legally incorrect and affected his substantial rights. (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *People v. Gomez* (2018) 6 Cal.5th 243, 312; § 1259.)

12

As to the merits of Celestine's argument, "[w]e review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) "We of course presume 'that jurors understand and follow the court's instructions.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 803 (*Wilson*).)

Celestine acknowledges that California courts have upheld instructions that included the same sentence from CALCRIM 1193 that he now challenges.[4] (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504; *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176; *Munch*, *supra*, 52 Cal.App.5th at pp. 473–474.) Nonetheless, Celestine contends that the precedent is incorrect because the instruction presents a "conflict" that would lead a reasonable juror to conclude from the expert's testimony that the alleged victim was sexually abused.

We are not persuaded by Celestine's argument that the existing precedent is wrong. We disagree with Celestine's view on the third sentence of the instruction. As a matter of logic, that sentence does not tell the jurors that the alleged victim's conduct is inevitably consistent with victimization. Moreover, assessing the instruction in light of the entire record, we are not convinced that there is a reasonable likelihood the jurors here applied the instruction in an impermissible manner. The instruction told the jurors that Dr. Carmichael's testimony could not be considered as evidence that Celestine "committed any of the crimes charged against him." Thus, the instruction explicitly precluded the use of that testimony to conclude inferentially from Doe's conduct and Dr. Carmichael's testimony that Celestine committed the charged crimes. Further, as

---

[4] The challenged sentence in this case reads: "You may consider this evidence only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

13

noted, the last sentence of the instruction did not compel a conclusion that Doe's conduct was consistent with being a sexual abuse victim. Moreover, Dr. Carmichael stated on cross-examination he was not opining on whether Doe was actually victimized.

Under these circumstances, we conclude that the trial court properly instructed the jury with a modified version of CALCRIM 1193, and Celestine's constitutional rights were not violated by that instruction.

B. *Prosecutor's Argument Regarding Lesser Related Offenses*

Celestine contends his defense counsel provided ineffective assistance by failing to object to statements by the prosecutor during closing argument that allegedly told the jurors that they could consider a lesser related offense only if they found Celestine not guilty of the greater charged offense.

1. Background

During trial, the parties agreed that the trial court would instruct the jury for all counts with the lesser related offense of lewd or lascivious act on a child aged 14 or 15 (§ 288, subd. (c)(1)).

Relatedly, the trial court instructed the jurors with CALCRIM No. 3517, which told the jurors, inter alia: "If all of you find that the defendant is not guilty of a greater charged crime, you may find him guilty of a lesser related crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime. A defendant may not be convicted of both a greater and lesser crime for the same conduct. [¶] . . . [¶] It is up to you to decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime."

After the trial court had instructed the jury as described, the prosecutor said the following in his closing argument, without objection: "There are lesser related offenses, which is lewd act of a child, age 14 or 15. [¶] I'm going to say this multiple times because every once in a while, jurors do not listen and ask us this question. *You don't*

14

*have to address a lesser related offense if you find him guilty of Counts 1, 2, and 3.* You only -- so you're going to have a verdict form. It's going to have I believe six pages, a page for each count. After each count is the lesser related. You leave the lesser related blank if you find him guilty of the greater offense, Counts 1, 2, and 3. [¶] If you find him not guilty of Counts 1, 2, or 3, you address the lesser related offenses for that particular count. [¶] So if you think that first time on -- close to Thanksgiving there was just not enough evidence of force -- maybe it was consensual. We have a reasonable doubt -- you find him not guilty of Count 1. And then you address the lesser related offense, which is he committed a lewd act with her." (Italics added.)

### 2. Legal Principles

In *People v. Kurtzman* (1988) 46 Cal.3d 322 (*Kurtzman*), the California Supreme Court held "that a court may 'restrict [] a jury from *returning a verdict* on a lesser included offense before acquitting on a greater offense' but may not 'preclude [it] from *considering* lesser offenses during its deliberations.' (Italics in original.) [Our Supreme Court] thereby impliedly rejected a 'strict acquittal-first rule under which the jury must acquit of the greater offense before even considering lesser included offenses.' "[5] (*People v. Berryman* (1993) 6 Cal.4th 1048, 1073, quoting *Kurtzman*, at p. 333, overruled on another ground by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

"Of course, it is misconduct for a prosecutor, during argument, to misstate the law." (*People v. Whalen* (2013) 56 Cal.4th 1, 77, disapproved of on another ground by *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17.) " 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal

---

[5] In *Kurtzman*, the California Supreme Court addressed a situation in which the trial court told the jury "that it must unanimously agree on whether defendant was guilty of second degree murder before 'considering' voluntary manslaughter." (*Kurtzman*, *supra*, 46 Cal.3d at p. 324.)

15

that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674.)

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958 (*Hoyt*); see also *Strickland v. Washington* (1984) 466 U.S. 668, 687.)  We can reject an ineffective assistance of counsel claim if the defendant fails to establish either element of the *Strickland* standard. (See *Strickland*, at p. 687; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

A "mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739, 772; see also *People v. Ledesma* (2006) 39 Cal.4th 641, 746.)  Further, "[i]f the challenged comments, viewed in context, 'would have been taken by a juror to state or imply nothing harmful, [then] they obviously cannot be deemed objectionable.' " (*People v. Cortez* (2016) 63 Cal.4th 101, 130.)  "Failure to raise a meritless objection is not ineffective assistance of counsel." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

16

3. <u>Analysis</u>

We are not persuaded that defense counsel's failure to object to the prosecutor's statements about the lesser related offenses amounts to conduct that is outside the range of reasonably professional assistance. Celestine makes no argument that the trial court's instruction with CALCRIM No. 3517 was incorrect. In addition, the trial court instructed the jurors that if they "believe that the attorneys' comments on the law conflict with [the court's] instructions, [they] must follow [the court's] instructions." (CALCRIM No. 200.) Further, the prosecutor's statements here did not plainly state that the jurors could not consider the lesser related offenses until they reached a verdict on the greater offenses. Rather, in accord with the trial court's instruction, the prosecutor's comments about the jurors not having to "address a lesser related offense" if they found Celestine guilty on the charged count focused on proper completion of the verdict forms depending on their verdict. The prosecutor's statements did not tell the jurors that they must eschew considering the lesser related offenses until they first decided to acquit Celestine of the greater charged crimes. Under these circumstances, defense counsel reasonably could have concluded that any objection to the prosecutor's statements was meritless.

Hence, we conclude there could be a satisfactory explanation for defense counsel's inaction in the face of the prosecutor's statements. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.) We thus reject Celestine's claim because he has not demonstrated any deficient performance by his defense counsel.

C. *Imposition of Upper Term*

Celestine contends that amendments made to section 1170, subdivision (b) (hereafter, section 1170(b)), which altered the requirements for imposition of an upper term, apply retroactively to this case and necessitate a remand for resentencing. (See

17

Stats. 2021, ch. 731 [Senate Bill 567; eff. Jan. 1, 2022].[6]) The Attorney General agrees that current section 1170(b) applies to this case. Nevertheless, the Attorney General asserts that a remand is unnecessary because any error was not prejudicial.

1. Background

Prior to pronouncing sentence at Celestine's December 2021 sentencing hearing, the trial court noted that it would "weigh[] the factors in aggravation against the factors in mitigation." The court stated further that although Celestine did not have a prior violent sex offense conviction, his criminal history was "significant" and not a factor in mitigation. The court found generally "as to each count that the factors in aggravation outweigh the factors in mitigation." The court also noted that "pursuant to the Penal Code section, these offenses are to be sentenced [as] the full term consecutive sentences." The court proceeded to impose the upper term on all counts, for a total term of 32 years in prison.[7]

For count 1 (forcible rape), the trial court noted that the victim here was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)[8]), the manner in which the offense was carried out indicated planning, sophistication, and professionalism (Rule 4.421(a)(8)), and Celestine took advantage of a position of trust (Rule 4.421(a)(11)).

After pronouncing sentence on count 1, the trial court explained that "in balancing these factors, [it] has been careful to utilize factors in aggravation with regard to each of the charges separately so that the Court is not blanketly considering certain factors, such

---

[6] The Legislature recently amended section 1170 again, but the new amendments (effective January 1, 2023) do not change the provisions relevant to our analysis of Celestine's claim. (See Stats. 2022, Ch. 744, § 1 [Assembly Bill No. 960].)

[7] Forcible rape of a minor who is 14 years of age or older (counts 1 & 3) is punishable "by imprisonment in the state prison for 7, 9, or 11 years." (§§ 264, subd. (c)(2), 261, subd. (a)(2).) Forcible oral copulation of a minor who is 14 years of age or older (count 2) is punishable "by imprisonment in the state prison for 6, 8, or 10 years." (§ 287.)

[8] Rule references are to the California Rules of Court.

18

as [Celestine's] criminal history, which the Court is not considering [for count 1], and more than one charge to aggravate the sentence. [¶] Although some of the factors in aggravation do apply to more than one count, if they do, the Court is specifically saying why they apply to the facts of that particular count, noting that Count 1 is on a separate day or separate night than Counts 2 and 3."

For count 2 (forcible oral copulation), the trial court stated that that crime involved great violence and a high degree of cruelty and callousness (Rule 4.421(a)(1)), and was carried out in a manner indicating planning, sophistication, and professionalism (Rule 4.421(a)(8)).

For count 3 (forcible rape), the trial court noted that Celestine "has served prior prison terms" (Rule 4.421(b)(3)), "has five prior felony convictions," and "[h]is performance on probation and PRCS [(postrelease community supervision)] was unsatisfactory" (Rule 4.421(b)(5)).

### 2. Legal Principles

Current section 1170, subdivision (b)(1) directs a trial court to impose not more than the middle term of a sentencing triad "except as otherwise provided in paragraph (2)." Paragraph (2) provides: "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, *and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial*." (§ 1170, subd. (b)(2), italics added.) Paragraph (3) provides: "Notwithstanding paragraphs (1) and (2) [of section 1170(b)], the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

Section 1170, subdivision (b)(4) provides: "The court may consider the record in the case, the probation officer's report, other reports, including reports received pursuant

19

to [s]ection 1203.03, and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing." (§ 1170, subd. (b)(4).) However, section 1170, subdivision (b)(4) does not permit the court to impose an upper term without compliance with section 1170, subdivision (b)(2) and (3). Under section 1170, subdivision (b)(5), the trial court must "set forth on the record the facts and reasons for choosing the sentence imposed. The court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (§ 1170, subd. (b)(5).)

### 3. Analysis

The Attorney General concedes that the amendments to section 1170 apply retroactively to Celestine. We agree. (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; *People v. Garcia* (2022) 76 Cal.App.5th 887, 902.)

The parties, however, dispute the issue of prejudice. Celestine argues that the record does not support the aggravating factors relied on by the trial court and the exception permitting consideration of a prior conviction based on a certified record of conviction (§ 1170, subd. (b)(3)) does not apply here. On the other hand, the Attorney General contends that a remand for resentencing is not necessary "because a jury would inevitably find true beyond a reasonable doubt all the factors relied upon by the trial court to support imposition of the upper terms for counts one through three." We agree with the Attorney General that no remand is required in this case.

The California Courts of Appeal are currently divided on the standard to be applied in determining whether there is harmless error when the defendant is sentenced under the former version of section 1170 and where the amended version applies retroactively to the defendant. (See, e.g., *People v. Flores* (2022) 75 Cal.App.5th 495, 500–501 (*Flores*) [error is harmless if the reviewing court determines, beyond a reasonable doubt, that the jury would have found, beyond a reasonable doubt, at least one

20

aggravating circumstance true]; *People v. Lopez* (2022) 78 Cal.App.5th 459, 467, fn. 11 [error is harmless if the "reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied"; if not, the reviewing court must then determine whether it is reasonably probable the "trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied"]; *People v. Wandrey* (2022) 80 Cal.App.5th 962, 982 (*Wandrey*), review granted Sept. 28, 2022, S275942 [reviewing court "must ask both whether we can be certain the jury would have found beyond a reasonable doubt the aggravating circumstances relied on by the court and whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of the middle term"]; *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1112 [reviewing court must first determine beyond a reasonable doubt that "jury would have found true at least one of the aggravating circumstances that the trial court relied on," and then second, determine whether, if the trial court relied on other aggravating circumstances, "it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error," which requires determining "for each aggravating fact, [] whether it is reasonably probable that the jury would have found the fact not true" and "then, with the aggravating facts that survive this review, [] whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts"]; *People v. Dunn* (2022) 81 Cal.App.5th 394, 409–410, fn. omitted, review granted Oct. 12, 2022, S275655 ["reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt"]; *id* at p. 410 [if not,

21

reviewing court must then determine "(2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)"].)

The issue of which prejudice standard applies to a reviewing court's determination whether a case should be remanded for resentencing in light of Senate Bill 567 is pending before the California Supreme Court. (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.)

In the present case, we need not decide which of the potential standards for assessing prejudice is correct because, on this record, we are convinced beyond a reasonable doubt that all the aggravating factors relied on by the trial court would have been found true beyond a reasonable doubt by the jury.

Regarding count 1, the trial evidence proved the three aggravating factors relied on by the trial court, namely Doe's vulnerability and Celestine's planning and exploitation of trust (Rule 4.421(a)(3), (8) & (11)). When Celestine committed the offense, Doe had only recently reunited with her mother and moved into their apartment, which was in an unsafe neighborhood. Doe did not have friends or other people she could trust there. Celestine appeared at Doe's apartment knowing that Doe's mother had left, used their prior dice-playing experiences to get inside, and victimized Doe after giving her marijuana. Based on these facts, the jury would find true beyond a reasonable doubt the stated aggravating factors.

Regarding count 2, the evidence established the aggravating factors regarding violence/cruelty, callousness, and planning (Rule 4.421(a)(1) & (8)). As noted by the trial court, Celestine used force during the oral copulation such that Doe could not breathe while he pushed her head down. He also warned Doe that her mother would get

22

arrested and Doe would be put back into the "system" if she told anyone about the victimization. Further, Celestine knew Doe had been drinking and that her mother had left the area before he offered to walk Doe to her apartment. Based on the facts presented at trial, the jury would find true beyond a reasonable doubt the aggravating factors relied on by the trial court.

Regarding count 3, the trial court selected the upper term based on Celestine's prior prison terms, five prior felony convictions, and past unsatisfactory performance on probation and PRCS (Rule 4.421(b)(3) & (5)). The record does not include any certified court or prison records establishing Celestine's prior criminal history. Rather, it appears that the trial court relied on the information provided in the probation officer's report to support the aggravating factors based on Celestine's criminal history. The probation report lists 19 prior adult offenses: 12 offenses from Santa Cruz County and seven offenses from Monterey County between April 2000 and March 2019, including five felony offenses (three of which were from Monterey County) and three prior prison terms (all resulting from Monterey County prosecutions). The probation report also notes nine violations of probation ("VOP") (six of which were from Monterey County) and one violation of PRCS (from Monterey County).[9]

At the sentencing hearing, Celestine did not challenge the accuracy of the probation report, including any assertion in the report regarding his criminal history. Furthermore, previously, at a pretrial hearing on the in limine motions, Celestine's defense counsel made no argument challenging the prosecutor's motion to impeach Celestine with three of his prior felony convictions, two of which were from Santa Cruz County and one from Monterey County. Defense counsel also acknowledged that she had previously represented Celestine in a matter that resulted in his 2019 misdemeanor conviction from Monterey County.

---

[9] The probation report states that the source of Celestine's criminal history information is "CLETS, Probation records, JPAW, CII #[], FBI #[]."

As these facts demonstrate, the aggravating factors relied on by trial court for count 3 were based mostly on events related to Celestine's criminal history that occurred in the Monterey County courts and/or involved the Monterey County Probation Department. The rest of the events presumably were readily provable based on information from neighboring Santa Cruz County. Under these circumstances, we conclude that either the jury would find true beyond a reasonable doubt the criminal history-based aggravating factors and/or certified records documenting Celestine's prior prison terms, prior felony convictions, and violations of probation and PRCS would have been submitted at trial in accord with section 1170, subdivision (b)(3). (See *Flores*, *supra*, 75 Cal.App.5th at pp. 500–501 [reviewing court determined beyond a reasonable doubt that jury would have found at least one aggravating circumstance true, in view of probation report's recitation of the defendant's criminal history, which was "information that is readily available from official records"].)

Under the facts and circumstances in this case, we are convinced that under any prejudice standard the trial court's failure to apply amended section 1170(b) was harmless. Furthermore, when sentencing Celestine, the trial court did not identify any mitigating factors, and none were stated in the probation report. As found by the jury, Celestine twice raped and orally copulated the 14-year-old victim on occasions in which he knew her mother was not present and after she had used intoxicating substances. He obtained her silence in part by telling her she would be taken away from her mother if she told anyone. A remand is not necessary if "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion" under a subsequently amended statute. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) This is true because "remand is not appropriate when it would be an idle act." (*People v. Jefferson* (2019) 38 Cal.App.5th 399, 409.) That standard is satisfied here. For these reasons, we reject Celestine's request for a remand for resentencing under current section 1170(b).

24

D. *Imposition of Full, Separate, and Consecutive Terms on Counts 2 and 3*

Celestine contends the trial court erred in imposing full-term, separate, consecutive sentences for counts 2 and 3 under section 667.6(d), because there was insufficient evidence that the conduct underlying those counts occurred on separate occasions. Alternatively, Celestine asserts that his defense counsel provided ineffective assistance by failing to object to the full, separate, and consecutive sentences on counts 2 and 3 because the crimes did not occur on separate occasions.

The Attorney General counters that the trial court apparently imposed the sentences on counts 2 and 3 under its discretionary authority pursuant to section 667.6, subdivision (c)—rather than subdivision (d)—which does not require a finding that the offenses were committed on separate occasions. The Attorney General further contends that Celestine's ineffective assistance claim lacks merit because the trial court did not make any findings under section 667.6(d), any failure to object was reasonable given the circumstances of this case and Celestine's criminal history, and it is not reasonably probable that the trial court would have imposed a lesser sentence even if counsel had argued that Celestine should be sentenced under section 1170.1, subdivision (a), instead of section 667.6, subdivision (c).

1. Background

Pretrial, the prosecutor wrote the following in his trial brief: "Pursuant to Penal Code[,] § 667.6(d), each charge must be run full term consecutive. Thus, the minimum possible sentence if convicted on all counts would be 20 years and served at 66% time. The maximum possible sentence if convicted would be 32 years and served at 66% time." (Boldface omitted.)

At the sentencing hearing, the prosecutor requested a 32-year prison sentence. Celestine's defense counsel asked the trial court, "when considering whether or not it's an upper term case," to consider Celestine's lack of prior sex offenses and that his prior offenses were "mostly drug related or theft related." Counsel also stated her belief that

25

Celestine "deserves a little bit less time than the 32 years." Neither party addressed whether counts 2 and 3 took place on separate occasions. Similarly, the probation officer's report did not mention section 667.6 and simply recommended a prison commitment "for the term prescribed by law."

As mentioned *ante* (part II.C.1.), the trial court said that "pursuant to the Penal Code section, these offenses are to be sentenced [as] the full term consecutive sentences." Further, when describing its consideration of the aggravating factors, the court "not[ed] that Count 1 is on a separate day or separate night than Counts 2 and 3." The trial court imposed full-term consecutive sentences without making any explicit findings related to whether the conduct underlying counts 2 and 3 occurred on separate occasions.

### 2. Legal Principles

"Section 1170.1 sets forth the general sentencing scheme for multiple convictions." (*People v. Belmontes* (1983) 34 Cal.3d 335, 343 (*Belmontes*).) Under subdivision (a) of section 1170.1, when any person is convicted of two or more felonies and a consecutive term of imprisonment is imposed, the aggregate term of imprisonment for all such convictions is "the sum of the principal term, the subordinate term, and any additional term imposed . . . . The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes . . . . The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed." (§ 1170.1, subd. (a).)

"Section 667.6, subdivision (c) is [] a much harsher sentencing measure than section 1170.1" (*Belmontes*, *supra*, 34 Cal.3d at p. 344), and applies to certain specified sex offenses specified in subdivision (e) of section 667.6, including forcible rape (§ 261, subd. (a)(2)) and forcible oral copulation (§ 287, subd. (c)(2)(C)—Celestine's crimes of conviction. (See § 667.6, subd. (e)(1) & (7).) Section 667.6, subdivision (c), states in relevant part: "In lieu of the term provided in [s]ection 1170.1, a full, separate, and

26

consecutive term *may be imposed* for each violation of an offense specified in subdivision (e) *if the crimes involve the same victim on the same occasion.* A term may be imposed consecutively pursuant to this subdivision if a person is convicted of at least one offense specified in subdivision (e)." (§ 667.6, subd. (c), italics added.)

By contrast to the discretionary consecutive sentencing permitted under section 667.6, subdivision (c), under subdivision (d)(1) of section 667.6, "[a] full, separate, and consecutive term *shall be imposed* for each violation of an offense specified in subdivision (e) *if the crimes* involve separate victims or *involve the same victim on separate occasions.*" (§ 667.6(d), italics added.) "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (§ 667.6, subd. (d)(2).[10])

"[T]he decision to sentence under section 667.6, subdivision (c) is a 'sentence choice' for which reasons must be stated." (*Belmontes*, *supra*, 34 Cal.3d at p. 347; see also Rule 4.426(a), (b).) "What is required is an identification of the criteria which justify use of the drastically harsher provisions of section 667.6, subdivision (c). The crucial factor . . . is that the record reflect recognition on the part of the trial court that it is making a separate and additional choice in sentencing under section 667.6, subdivision

---

[10] At the time of Celestine's sentencing, the text of section 667.6(d), was not divided into subsections, as it is presently. (Compare Stats. 2018, ch. 423, § 67 [eff. Jan. 1, 2019] with Stats. 2021, ch. 626, § 30 [eff. Jan. 1, 2022].) Further, although the text of former subdivision (d) of section 667.6 is different than current subdivision (d), the differences relate only to the previous inclusion of gender pronouns and are immaterial to our analysis. (§ 667.6(d).)

(c)." (*Belmontes*, at p. 348.) "The ideal method of proceeding would be for the trial court first to decide generally between concurrent and consecutive terms, following the criteria listed in rule [4.425]. Once the court has decided to sentence a defendant to consecutive terms and has stated its reasons therefor, it then must decide whether the consecutive terms should be under the principal/subordinate scheme of section 1170.1 or under the full and separate term scheme of section 667.6, subdivision (c). If the latter is chosen, the reasons therefor should be stated for the record." (*Ibid.*)

By contrast, the trial court is not required to provide a statement of reasons when imposing consecutive sentences under section 667.6(d). (*People v. Craft* (1986) 41 Cal.3d 554, 559 (*Craft*), superseded by statute on another ground as stated in *People v. Pena* (1992) 7 Cal.App.4th 1294, 1314.) When a trial court imposes consecutive sentences under section 667.6(d), a reviewing court may reverse only if the record does not contain substantial evidence that the offenses were committed on separate occasions, that is, "only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092 (*Garza*).)

### 3. Analysis

The Attorney General asserts that Celestine's claim is "misplaced" "[b]ecause it appears that the trial court imposed the sentences under subdivision (c) rather than [subdivision] (d)" of section 667.6. The Attorney General grounds his assertion on the fact that the court did not make any findings as to whether the crimes in counts 2 and 3 occurred on separate occasions and because "there is no evidence the court believed consecutive terms were mandatory."

Celestine replies that the trial court failed to identify the criteria justifying the use of section 667.6, subdivision (c), and nothing in the record indicates the court recognized it was making an additional sentencing choice under that subdivision.

As described above, regarding the imposition of consecutive sentences, the trial court said only that "pursuant to the Penal Code section, these offenses are to be sentenced [as] the full term consecutive sentences" and noted that count 1 occurred "on a separate day or separate night than Counts 2 and 3." The trial court did not specifically state any reasons for imposing full, separate, consecutive sentences for counts 2 and 3. Further, although the prosecutor's trial brief invoked section 667.6(d), the probation report did not address the application of either subdivision (c) or (d) of section 667.6.

As there was no mention of section 667.6, subdivision (c) in any of the materials submitted to the trial court and the court itself did not make any of the requisite findings, we cannot conclude that the trial court imposed full consecutive sentences on counts 2 and 3 pursuant to its discretionary authority under section 667.6, subdivision (c). Nevertheless, we decide that the record supports a conclusion that the trial court implicitly found that the crimes in counts 2 and 3 involved separate occasions under section 667.6(d). (See *Craft*, *supra*, 41 Cal.3d at p. 559; see also *People v. Thomas* (2011) 52 Cal.4th 336, 361; cf. *People v. Irvin* (1996) 43 Cal.App.4th 1063, 1070–1072.)

Having concluded that the consecutive sentencing on counts 2 and 3 occurred under section 667.6(d), we turn next to whether the record contains substantial evidence that the forcible oral copulation (count 2) and forcible rape (count 3) were committed on separate occasions that night around New Year's Eve in Celestine's apartment. " '[A] forcible violent sexual assault made up of varied types of sex acts committed over time against a victim is not necessarily one sexual encounter.' " (*People v. Jones* (2001) 25 Cal.4th 98, 104.) The separate occasions test does not "require[] a break of any specific duration or any change in physical location." (*Ibid.*) Our inquiry focuses on whether "no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*Garza*, *supra*, 107 Cal.App.4th at p. 1092.)

Regarding counts 2 and 3, Doe testified that Celestine sat on the bed, grabbed the back of Doe's neck, pulled her towards him, told her to open her mouth, forced her down, put his penis in her mouth, and pushed her head down. After Doe tried to pick her head up, Celestine pushed down harder on the back of her neck. Doe could not breathe and started crying. When she tried again to pull her head up, Celestine "let go." Doe had tears on her face. Still holding Doe's neck, Celestine next pushed Doe facedown onto the bed and pulled down her pants. He got behind Doe, let go of her neck, and pushed his penis into her vagina. Doe was scared and cried, and Celestine put his hand over her mouth and angrily told her to stop making noise. The rape lasted a couple of minutes.

These facts demonstrate that Celestine had a reasonable opportunity for reflection between the completion of the oral copulation (i.e., when Celestine let Doe pull her head up from his penis after she was choking and crying) and the beginning of the forcible rape. When Celestine moved on to raping Doe, she was sitting on the bed with tears on her face and her pants on. He not only ignored Doe's tears and repositioned her and himself, but he pulled down her pants. Celestine's decision-making evinces a reasonable opportunity to reflect on what he was doing to Doe. Because a reasonable trier of fact could have found, on this record, that the offenses were committed on separate occasions, we conclude the trial court did not err in imposing consecutive sentences.[11] (See *Garza*, *supra*, 107 Cal.App.4th at pp. 1092–1093; cf. *People v. Dearborne* (2019) 34 Cal.App.5th 250, 265–266.)

E. *Constitutional Challenge to Sentencing Under Section 667.6(d)*

Celestine claims that because the trial court, rather than the jury, made factual findings that counts 2 and 3 occurred "on separate occasions" (§ 667.6, subd. (d)(1)), the imposition of mandatory full-term, separate, and consecutive sentences on those counts prejudicially violated his right to a jury trial under the Sixth and Fourteenth Amendments.

---

[11] Because we reject Celestine's claim on the merits, we need not address his alternative claim of ineffective assistance of counsel.

Celestine argues that "the fact that a count involved the same victim on a 'separate occasion' is an 'element' that under the Sixth Amendment must be found by a jury, not a judge."

The Attorney General counters, again, that Celestine's claim is misplaced because the trial court did not sentence Celestine under section 667.6(d) and argues further that, in any event, the constitutional right to a jury trial does not extend to the separate occasions determination under section 667.6(d).

In 2008, our Supreme Court rejected a claim that the trial court's decision to impose consecutive sentences under section 667.6(d) violated the defendant's Sixth Amendment right to a jury determination of all critical facts supporting a greater potential sentence. (*Wilson*, *supra*, 44 Cal.4th at pp. 808, 813.) Our high court concluded that the jury trial right did not apply to the sentencing choice to impose consecutive rather than concurrent sentences. (*Id*. at p. 813; see also *People v. King* (2010) 183 Cal.App.4th 1281, 1324 [rejecting a claim that the "separate occasions" issue under section 667.6(d) must be submitted to the jury].)

Recently, in *Wandrey*, *supra*, 80 Cal.App.5th 962, review granted, Division Two of the First District Court of Appeal rejected a challenge essentially identical to that raised by Celestine in the present case. (*Id*. at pp. 978–980.) The *Wandrey* court discussed the United States Supreme Court's decisions in *Alleyne v. United States* (2013) 570 U.S. 99 and *Oregon v. Ice* (2009) 555 U.S. 160, and decided that "[t]he factual question whether multiple offenses were committed on separate occasions does not involve an element of any discrete offense." (*Wandrey*, at p. 980.)

As the *Wandrey* court noted, "[t]his issue is currently before the California Supreme Court in *People v. Catarino*, review granted January 19, 2022, S271828."[12] (*Wandrey*, *supra*, 80 Cal.App.5th at p. 979, fn. 28.)

Like the *Wandrey* court, we are not persuaded that the constitutional right to a jury trial applies to the separate occasions determination under section 667.6(d). The consecutive sentencing decision under section 667.6(d) does not amount to an element of the charged crimes and falls outside the purview of the jury trial right. (*Wandrey*, *supra*, 80 Cal.App.5th at pp. 979–980.) We thus reject Celestine's claim that his constitutional rights were violated by the trial court's imposition of full-term, separate, and consecutive sentences on counts 2 and 3.

F. *Fines and Assessments*

At Celestine's sentencing hearing, the trial court imposed a $7,500 restitution fine (§ 1202.4, subd. (b)), a $1,230 sex offense fine (including penalty assessments) (§ 290.3), a $120 court operations assessment (§ 1465.8), and a $90 court facilities assessment (Gov. Code, § 70373). Celestine's defense counsel did not object to or assert an inability to pay any of these fines and assessments.

A few months after the sentencing, Celestine's appellate counsel sent a letter to the trial court asking it to stay the restitution fine and to strike the sex offense fine and the two assessments pursuant to *Dueñas*, *supra*, 30 Cal.App.5th 1157. Citing statements in the probation officer's report concerning Celestine's purported lack of prior employment and receipt of assistance related to employment and housing prior to his arrest, appellate counsel argued that "it is highly unlikely [Celestine] has any assets he can use to pay the

---

[12] The question pending before our Supreme Court in *People v. Catarino* (S271828) is: "Does section 667.6, subdivision (d), which requires that a full, separate, and consecutive term must be imposed for certain offenses if the sentencing court finds that the crimes involved the same victim on separate occasions, comply with the Sixth Amendment to the United States Constitution?" (*Wandrey*, *supra*, 80 Cal.App.5th at p. 979, fn. 28.)

fines and assessments" and, assuming Celestine could obtain a job in prison, "it will take Mr. Celestine over one hundred and twenty-four years to repay the fines and assessments imposed."[13]  (Italics omitted.)

The trial court denied appellate counsel's request.  The court concluded that, because the case was pending appeal, it lacked "jurisdiction to take any action affecting the judgment . . . except to correct clerical errors or set aside a void judgment."  The court further stated that "[t]o the extent [it] retains the authority to grant [Celestine's] request to stay fines and fees pursuant to Penal Code section 1467, the court respectfully declines to do so."

On appeal, Celestine contends that the trial court abused its discretion by denying his postjudgment request to stay the restitution fine and to strike the sex offense fine and the two assessments, in violation of his constitutional rights to due process and equal protection and against excessive fines.  He argues that the trial court had jurisdiction over his request under section 1237.2 and further made an "irrational and arbitrary" decision to deny his request given his indigency.  Alternatively, Celestine asserts that his defense counsel rendered constitutionally ineffective assistance by failing to object under *Dueñas* at his sentencing because he lacked the ability to pay the fines and assessments.

The Attorney General counters that Celestine forfeited his claim because he neither objected at sentencing to the fines and assessments nor argued that he lacked the ability to pay them.  Relatedly, the Attorney General asserts that Celestine's postjudgment request does not excuse the failure to object at sentencing.  Regarding the alleged ineffective assistance of defense counsel, the Attorney General contends that Celestine's counsel may have had a strategic reason for withholding an objection and,

---

[13] Appellate counsel appears to have calculated the 124-years figure by using the lowest wage paid to inmates (eight cents per hour, with a maximum income of $12 per month).  At the highest wage (37 cents per hour, with a maximum income of $56 per month), the projected repayment period drops to 26 years.

regardless, Celestine cannot show prejudice because the trial court's postjudgment refusal to stay the fines and assessments indicates that such a request at sentencing would have been denied. As to the underlying merits of Celestine's claim, the Attorney General asserts that the punitive fines were not unconstitutionally excessive, do not implicate due process protections, and were not arbitrarily or irrationally imposed. The Attorney General also argues any due process violation that may have occurred by imposing the two assessments (totaling $210) without determining Celestine's ability to pay them was harmless beyond a reasonable doubt, because Celestine's "earnings during the period of his incarceration will be more than sufficient to cover that amount."

    1.  <u>Analysis</u>

Beginning with the threshold issue of forfeiture, we agree with the Attorney General that Celestine forfeited his current challenge to the fines and assessments by failing to object at sentencing and his postjudgment letter to the trial court does not render his claim preserved for our appellate review.

The forfeiture rule applies to a claim relating to the imposition of fines, fees, or assessments which was not first raised at sentencing. (See *People v. Greeley* (2021) 70 Cal.App.5th 609, 624.) Moreover, the general rule is that the filing of a valid notice of appeal vests jurisdiction of the cause in the appellate court until determination of the appeal and issuance of the remittitur, thereby divesting the trial court of jurisdiction over anything affecting the judgment. (See *People v. Flores* (2003) 30 Cal.4th 1059, 1064.) Celestine's letter did not reinvest the trial court with jurisdiction over factual issues related to his ability to pay the fines and assessments and does not excuse his failure to object at sentencing on the indigency-based grounds he raises in this appeal, which includes several other claims of error. (See *People v. Jenkins* (2019) 40 Cal.App.5th 30, 37–38; *People v. Jinkins* (2020) 58 Cal.App.5th 707, 712–713; § 1237.2; see also *People v. Clark* (2021) 67 Cal.App.5th 248, 255–257; *People v. Jordan* (2018) 21 Cal.App.5th 1136, 1141.) Because the trial court lacked jurisdiction to alter the fines and assessments

on the grounds Celestine asserted pending this multi-issue appeal, the court's denial of his request is void. (See *People v. King* (2022) 77 Cal.App.5th 629, 634–635.)

Having concluded that Celestine's claim of error is forfeited, we turn to his alternate claim of ineffective assistance of counsel. "In January 2019, *Dueñas* held that 'due process of law requires [a] trial court to . . . ascertain a defendant's present ability to pay before it *imposes*' (1) 'court facilities and court operations assessments' (under Pen. Code, § 1465.8 and Gov. Code, § 70373, respectively), or (2) a restitution fine (under Pen. Code, § 1202.4). (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164, italics added; see *id.* at pp. 1167, 1172; see also, *id.* at p. 1172 [restitution fine imposed without an ability to pay hearing must be stayed until such a hearing is conducted].)" (*People v. Hicks* (2019) 40 Cal.App.5th 320, 325, review granted Nov. 26, 2019, S258946 (*Hicks*).)[14]

Similarly, in *People v. Cowan* (2020) 47 Cal.App.5th 32, review granted June 17, 2020, S261952, the Court of Appeal concluded that "[b]ecause ability to pay is an element of the excessive fines calculus under both the federal and state Constitutions," "a sentencing court may not impose court operations or facilities assessments or restitution fines without giving the defendant, on request, an opportunity to present evidence and argument why such monetary exactions exceed his ability to pay." (*Cowan*, *supra*, 47

---

[14] Panels of this court and other Courts of Appeal have reached differing conclusions on whether *Dueñas* was correctly decided, and the issue is pending before the California Supreme Court. (See, e.g., *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844 (*Kopp*); *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1068 (*Aviles*) [concluding that *Dueñas* was wrongly decided and its "analysis is 'fundamentally flawed in that general "fairness" grounds of due process and/or equal protection principles do not afford a defendant a preassessment ability-to-pay hearing before a trial court imposes fines and fees on him or her.' "]; *Hicks*, *supra*, 40 Cal.App.5th at p. 325, review granted; *People v. Adams* (2020) 44 Cal.App.5th 828, 831–832 [concluding that "*Dueñas* was wrongly decided"]; *People v. Petri* (2020) 45 Cal.App.5th 82, 90 [finding that *Dueñas* was not "persuasive"].) For the reasons stated *post* regarding ineffective assistance of counsel, we need not address the merits of *Dueñas* in this case.

Cal.App.5th at p. 48 [review granted and the matter deferred pending consideration and disposition of a related issue in *Kopp*, *supra*, 38 Cal.App.5th 47, review granted].)

As discussed *ante* (part II.B.2.), Celestine must show both deficient performance and prejudice to prevail on a claim of ineffective assistance of counsel. (*Hoyt*, *supra*, 8 Cal.5th at p. 958.) Furthermore, "rarely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) We will find ineffective assistance of counsel only if "there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926; see also *Mai*, *supra*, 57 Cal.4th at p. 1009.)

Generally, "a defense counsel's decision whether to object to the imposition of fines and fees can encompass factors beyond a defendant's financial circumstances, especially in serious cases involving potentially long prison sentences." (*People v. Acosta* (2018) 28 Cal.App.5th 701, 707.) "We cannot speculate, given the absence of information before us, what led to defense counsel's decision not to object, but a myopic focus on [the defendant's] financial circumstances that neglects any of the other factors at play in a sentencing hearing may not provide an accurate picture of counsel's strategic calculus." (*Ibid.*)

Here, the record does not disclose why Celestine's defense counsel did not object to the fines and assessments or request a hearing on Celestine's ability to pay them. We cannot say there could be no satisfactory explanation for defense counsel's inaction regarding the fines and assessments. Celestine was 42 years old at the time of his sentencing and counsel could have reasonably considered Celestine's ability to earn wages in prison as a reason for not objecting or requesting an ability-to-pay hearing. (See *Aviles*, *supra*, 39 Cal.App.5th at pp. 1062, 1076–1077 [concluding that a defendant sentenced to a prison term of 82 years to life had the ability to pay $10,600 in restitution fines, $160 in court operations assessments, and $120 in court facilities assessments from either prison wages or monetary gifts from family and friends during his lengthy prison

36

sentence]; see also *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.) " '[E]very able-bodied prisoner' must work while imprisoned. [Citation.] Prison wages range from $12 to $56 per month, depending on the job and skill level involved. [Citation.] Up to 50 percent of [a prisoner's] wages and trust account deposits will be deducted to pay any outstanding restitution fine, plus another 5 percent for the administrative costs of this deduction." (*People v. Cervantes* (2020) 46 Cal.App.5th 213, 229.) " '[A]n inmate's assignment to a paid position is a privilege dependent on available funding, job performance, seniority and conduct.' " (*Ibid*.) We acknowledge that Celestine would have to work for many years in prison to earn enough to pay off the amount imposed, but he is relatively young and told the probation officer that "his health is 'good.' "

Additionally, Celestine has not demonstrated for purposes of the excessive fines clause that the aggregate amount imposed is grossly disproportionate to his level of culpability and the harm he caused, even assuming the validity of his assertion of indigency. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1048–1049, 1058.) That his defense counsel failed to make a futile objection based on the protection against excessive fines does not amount to deficient performance. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463.) For these reasons, we cannot conclude on the record before us that defense counsel provided deficient representation to Celestine.

Even if we were to assume that Celestine's defense counsel performed deficiently, Celestine has not met his burden to show prejudice resulting from counsel's failure to object and to request an ability-to-pay hearing. Again, the facts in the record do not demonstrate definitively that Celestine is and will be unable to pay the aggregate amount of $8,940 or that the amount imposed is excessive. Thus, we cannot say there is a reasonable probability the result of Celestine's sentencing would have been more favorable to him, in that the trial court would have reduced or eschewed the fines and assessments had defense counsel objected and requested a hearing. (See *People v. Keene* (2019) 43 Cal.App.5th 861, 864–865.)

## III.  DISPOSITION

The judgment is affirmed.

_____
                Danner, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P.J.

_____
Wilson, J.

**H049673**
*People v. Celestine*